UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NELLIE TRAINOR,

             Plaintiff,                       Civil Action No. 13-10093

      v.                                 District Judge Terrence G. Berg
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [14] AND**
**DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]**

Plaintiff Nellie Trainor filed this suit to challenge Defendant Commissioner of Social Security's determination that she was not under a "disability" as defined in the Social Security Act. (*See* Dkt. 1, Compl.) Starting in 1987, Trainor worked various jobs, including as a cashier, nurse's aide, and a part checker. (Dkts. 11, 19, 19-1, Administrative Record ("Tr.") 87.)[1] In 2002, Trainor, then age 30, was diagnosed with dermatomyositis. (Tr 163.) At times relevant to this case, Trainor also suffered from diabetes, obesity, hypertension, fibromyalgia, sleep apnea, neural foramen stenosis, a congenital spinal abnormality, and depression. (*See* Tr. 20.) Trainor, believing that these impairments prevent her from working a full-time job, applied for social security disability insurance benefits and supplemental security income. An administrative law judge, acting on behalf of the

_____

[1]There were some problems docketing the administrative record in this case. In particular, the transcript that was initially docketed (Dkt. 11) was incomplete. After the Court contacted the parties, the Commissioner supplied the remainder of the record. (Dkt. 19.) Pages 1-466 and 487-567 of the transcript are found at docket entry 11, pages 467-486 are found at docket entry 19-1, and pages 568-771 are found at docket entry 19.

Commissioner of Social Security ("Commissioner") concluded that Trainor was not disabled.

All matters have been referred to this Court for disposition or recommendation pursuant to Eastern District of Michigan Local Rule 72.1(b)(3). (*See* Dkt. 2.) Now before the Court for a report and recommendation are the parties' cross-motions for summary judgment. (Dkts. 14, 17.) Having reviewed the briefs and the administrative record, this Court concludes that Trainor has not shown that the administrative law judge reversibly erred in assessing her credibility and has not otherwise demonstrated reversible error. The Court, however, believes that a readily identifiable error in the proceedings below is not plainly harmless and therefore justifies remand. As such, this Court RECOMMENDS that Trainor's Motion for Summary Judgment (Dkt. 14) be GRANTED IN PART, that the Commissioner's Motion for Summary Judgment (Dkt. 17), be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the disability determination of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

### A. Procedural History

Trainor filed applications for disability insurance benefits or supplemental security income on three different occasions. The Commissioner's denial of Trainor's third application is the one appealed here. The Court provides a brief procedural history of the other two.

Trainor filed her first application for disability insurance benefits in 2002. (Tr. 68-70.)  In March 2005, Administrative Law Judge Lubomry Jahnycky concluded that while Trainor's dematomyositis, dizzy spells, and diabetes were "severe" impairments, Trainor was not disabled. (Tr. 43-49.)

In July 2005, Trainor filed a second application for disability insurance benefits, and also

2

filed for supplemental security income. (Tr. 300; *see also* Tr. 222-24.) She claimed that she became disabled on March, 17, 2005, the day following Administrative Law Judge Jahnycky's decision. (Tr. 300.) In May 2008, Administrative Law Judge David Neumann concluded that while Trainor suffered from severe impairments of "depression, hypertension, diabetes mellitus, a history of sleep apnea, dermatomyositis[,] . . . and lumbar radiculopathy" she was not disabled. (Tr. 300-14.) Due to some type of filing error, Administrative Law Judge Neumann's decision was not reviewed by the Social Security Administration's Appeals Council or appealed to federal court. (*See* Tr. 336.)

Instead, in July 2009, Trainor again applied for disability insurance benefits and supplemental security income. (Tr. 338-347.) In both applications, Trainor alleged a disability onset date of May 13, 2008, the day following Administrative Law Judge Neumann's decision. (Tr. 17.) In August 2009, Trainor's application for disability insurance benefits was denied at the initial level because her alleged onset date was after the date that she was last insured for those benefits. (*See* Tr. 18.) Then, in December 2009, Trainor's application for supplemental security income was initially denied. (Tr. 17.) Trainor requested a hearing before an administrative law judge, and, on December 30, 2010, the Administration informed her that she had been granted a hearing on both her disability insurance benefits and supplemental security income applications. (Tr. 17-18.) On February 10, 2011, Trainor testified before Administrative Law Judge Nancy Lisewski ("the ALJ"). (Tr. 547-67.) On April 7, 2011, the ALJ concluded that Trainor was not under a "disability" as that term is used in the Social Security Act. (Tr. 17-33.) On November 16, 2012, the Social Security Administration's Appeals Council denied Trainor's request for further administrative review thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 9.) This suit challenges that decision.

**B. Medical Evidence**

**1. Medical Treatment Prior to ALJ Jahnycky's March 2005 Decision**

In February 2002, Trainor, then 30 years old, saw Dr. Earl Rudner at the Dermatology Clinic of the Henry Ford Medical Group in Detroit ("Henry Ford"). (Tr. 163.) Dr. Rudner described Trainor's onset of dermatomyositis this way:

> Starting two weeks prior to the recent Christmas holiday she developed an acute eruption on the hands with subsequent spreading to the face, trunk and extremities. She has also developed recurrent symptoms of muscle soreness, most prominent in the proximal arm and proximal lower extremity with fatigue, dysphagia [difficulty swallowing], difficulty combing her hair, difficulty getting out of a chair, difficulty with getting up stairs, arthralgias in the hip, occasional nausea and occasional intermittent shortness of breath.

(Tr. 163.) Dr. Rudner diagnosed dermatomyositis, prescribed prednisone, and gave Trainor a three-month work excuse. (Tr. 164.)

The next month, Trainor saw Dr. David Fivenson at the Dermatology Clinic at Henry Ford. (Tr. 160-62.) Dr. Fivenson noted that prednisone had "significantly improved [Trainor's] condition." (Tr. 160.) He put Trainor on a prednisone taper and prescribed Plaquenil (a disease-modifying antirheumatic drug). (Tr. 161.) Dr. Fivenson also provided Trainor with pulmonary, opthalmology, neurology, rheumatology, and ENT consults. (Tr. 161-62.)

In June 2002, Trainor had consultations with two specialists at Henry Ford: Dr. James Leisen, an orthopedist, and Dr. Naganand Sripathy, a neurologist. (Tr. 141-43, 149-50.) Dr. Leisen provided: "This lady has dermatomyositis, which is under treated." (Tr. 149.) Dr. Leisen spoke with Dr. Sripathy about an EMG and muscle biopsy; the two also "agreed on higher doses of corticosteroids and intravenous immunoglobulin." (Tr. 149.) Dr. Sripathy noted that while prednisone had improved Trainor's rash, Trainor's muscle weakness had not improved. (Tr. 141.)

4

"She still gets the cramps in the fingers and the feet. She has very much limited exercise tolerance. . . . She has considerable difficulty climbing stairs. She takes frequent rests at home also. She also has shortness of breath which has gotten worse for the last few months and she noticed it [with] the decrease of her prednisone dose." (*Id.*) Dr. Sripathy performed a neurological exam and opined that Trainor had "clinical evidence of myopathy involving both proximal and, to a certain extent, distal muscles . . . . She is still very much limited by the activities." (Tr. 143.) He noted that an electrodiagnostic needle exam had revealed "mostly inactive myopathy." (Tr. 148.) He thought that Trainor should undergo CT scans of her chest, abdomen, and pelvis. (Tr. 148.) These scans, performed in August 2002, were negative except for the pelvis study; it showed "cystic changes within the right adnexa . . . likely within the right ovary." (Tr. 137.)

In August 2002, Trainor returned to the Dermatology Clinic at Henry Ford. (Tr. 139.) Dr. Carrie Cusack noted that the EMG that Dr. Sripathy had performed showed "treated myopathy." (Tr. 139.) Dr. Cusack opined, "From her skin findings, the patient is significantly improved. We would like her to follow up with neurology and Dr. Leisen." (Tr. 140.)

In September 2003, Dr. Robert Mutch noted that pathology results showed "high grade CIN 3" (Tr. 179), i.e., "severely abnormal cells [were] found on the surface of [Trainor's] cervix," National Cancer Institute, *CIN 3*, http://goo.gl/x318Kq (last visited Jan. 27, 2014). Accordingly, in October 2003, Trainor underwent a total abdominal hysterectomy. (Tr. 181-83.) In December 2003, Dr. Mutch noted, "The patient denies any complaints whatsoever." (Tr. 176.)

In January 2005, Dr. Terry Rudolph, a licensed psychologist, evaluated Trainor for Michigan's Disability Determination Service ("DDS"). (Tr. 168-75.) Dr. Rudolph summarized his mental-status exam findings as follows: "Her immediate memory seemed poor, but her delayed and

distant memory seemed adequate. She was able to perform simple computations, but had difficulty with sequential calculations. Her reasoning was literal and concrete, but her judg[]ment seemed appropriate." (Tr. 171.)

### 2. Medical Treatment Between ALJ Jahnycky's March 2005 Decision and ALJ Neumann's May 2008 Decision

Beginning in 2005, and continuing up to the time of her hearing before ALJ Lisewski, Trainor sought regular treatment from Nancy Hunt, RN, CNP.[2]

In May 2005, Trainor, then 34 years old, saw Hunt for her annual examination, the last of which was completed a year-and-a-half earlier. (Tr. 260.) Trainor said her legs cramped at night and that her leg occasionally felt like it was giving out on her. (*Id.*) Hunt prescribed Naprosyn, continued Fioricet (for headaches) and Zantac (apparently for heartburn), and increased Zoloft. (Tr. 261.) She also referred Trainor to Dr. Seyed Rizvi, a rheumatologist. (*Id.*)

Trainor saw Dr. Rizvi in June 2005 and then again in July, when he started Trainor on Neurontin. (Tr. 264.) On September 14, 2005, Dr. Rizvi wrote a letter to DDS describing Hunt's condition:

> I have been seeing Nellie Trainor as a patient since 6-10-05 for fibromyalgia. She is able to do activities of daily living and work on a daily basis. For her maximum capacity to sit, stand, walk, lift, carry, handle objects, hear, speak and travel, I recommend that she should undergo functional evaluation capacity by a trained physical therapist to evaluate her functional capacity.

(Tr. 265.)

In October 2005, an x-ray and a CT scan of Trainor's lumbar spine were taken. (Tr. 578-79.)

---

[2]In completing forms for her disability applications, Trainor provided that she started seeing Hunt in 2003. (Tr. 252.) The administrative record only contains Hunt's treatment records from May 2005 onward.

They showed mild degenerative changes and mild bulging at L3-4 and L5-S1 but without canal or lateral recess stenosis. (*Id.*)

In November 2005, Hunt opined on Trainor's residual functional capacity. (Tr. 274-76.) She provided that Trainor could lift only 5 pounds for up to one-third of an eight-hour day. (Tr. 274.) She thought that Trainor could stand or walk for one to two hours without interruption and sit for two hours without interruption. (Tr. 274-75.) She also provided that Trainor could sit for four to six hours total in an eight-hour day. (Tr. 275.) Regarding Trainor's sitting limitation, Hunt noted, "due to bulging disc in back prolonged sitting [is] affected." (Tr. 275.)

In 2006, Trainor saw Hunt on a regular basis for headaches, depression, numbness and tingling in her feet, and back pain. In February, Trainor reported that Imitrex had provided some relief for her headaches. (Tr. 727.) Trainor thought that Prozac had not been effective for her depression, and so Hunt prescribed Zoloft. (Tr. 727.) In March 2006, Trainor reported numbness and tingling in her feet that Hunt thought was related to neuropathy. (Tr. 726.) Hunt noted that Trainor's headaches were "[i]mproving." (*Id.*) In April, Trainor told Hunt that she was disappointed with a recent visit to Dr. Rizvi as he did not address her pain issues but was focused on Trainor's lack of sleep. (Tr. 724.) Hunt noted that Neurontin had provided some relief from numbness and tingling. (*Id.*) In May, Trainor said that Prednisone had not made any difference in her pain. (Tr. 722.) Trainor had reduced her weight by 24 pounds, which Hunt encouraged. (Tr. 722-23.) In August 2006, Trainor reported that she was still having back pain, that she wanted to go to a rheumatologist other than Dr. Rizvi, that Neurontin was not helping, and that her right leg would occasionally give out. (Tr. 719.) Xanax and Zoloft were keeping Trainor calm, however. (*Id.*) Hunt noted, "The patient does have some difficulty keeping all medications straight and knowing exactly what medications

are for what, even though written instructions were given following each visit." (Tr. 719.) In November 2006, Trainor reported to Hunt that she had seen a neurologist who had not suggested changes in her treatment. (Tr. 717.) Trainor also mentioned seeing a new rheumatologist, Dr. VanDalen, who thought she had fibromyalgia in addition to dermatomyositis. (*Id.*) Dr. VanDalen had started Trainor on Lyrica. (*Id.*)

In February, July, and August 2007, Trainor saw Hunt and Dr. VanDalen for lightheadedness, pain, and fatigue. In February, Trainor stated that she was having pain and tingling in her arms and legs; but Trainor had run out of Lyrica, and she thought that might be the reason that her pain had increased. (Tr. 715.) Trainor mentioned that she had missed her appointment with Dr. VanDalen earlier in the month and had not yet rescheduled. (*Id.*) Hunt wrote, "She does seem to be a little bit better as far as feeling more rested and less amount of pain and fatigue. She states that her diabetes has been fairly well controlled and she does have a headache today but they have been rather controlled also." (*Id.*) In July, Trainor told Hunt that she felt lightheaded and "sort of spacey" at times and that her right hip occasionally felt as if it would give out. (Tr. 712.) Trainor reported fatigue, but Hunt noted that Trainor was busy with "Work First" and that may have contributed to her fatigue. (Tr. 712.) Hunt again wrote, "The patient really is not aware of what medications she is on and what she is not on." (*Id.*) In August, Trainor told Hunt that Dr. VanDalen had increased her dosage of Lyrica. (Tr. 710.) Trainor stated that Wellbutrin had helped with her depression, but she still felt tired. (*Id.*) Hunt noted, "[c]hronic fatigue; will rule out sleep apnea." (Tr. 711.)

Later in August 2007, Trainor reported a turn for the worse. She was feeling terrible, extremely fatigued, and off balance. (Tr. 708.) She had pain in her back that radiated down her leg, and her right leg was weak and felt like it was going to give out. (*Id.*) Hunt wrote, "She has been

8

going to classes for [W]ork [F]irst and, apparently, has been doing a part time job which is getting too much for her. She is thoroughly exhausted and uncomfortable by the time she gets home at night. She is emotionally distressed and cannot do it anymore. The patient is stressed to the max, as she puts it[,] and just cannot keep going on like this." (*Id.*) Trainor was upset that "they [were] pushing her to work when [her] rheumatologist and [Hunt's] office stated that she was unable to work a full 40-hour week." (*Id.*) Hunt assessed chronic fatigue, chronic back pain with weakness and right-leg paresthesia, possible restless leg syndrome, "insomnia/sleep deprivation," and stress syndrome. (Tr. 709.) Hunt ordered a lumbar-spine MRI, completed sleep-study forms, and limited Trainor to "20 hours per week but no more than 4 hours daily due to physical condition." (Tr. 709.)

In September 2007, Trainor underwent a follow-up lumbar spine MRI. The radiologist's impression: "Stable mild L4-5 disc bulging from 2005. No new disc herniation or spinal stenosis seen. Stable congenital tethered cord, without associated meningocele or other tumor." (Tr. 576.)[3]

In October 2007, Trainor reported having two or three 20-minute dizzy spells in the prior three weeks. (Tr. 706.) According to Hunt's notes, Trainor had reported these spells to Dr. Nalini Samuel, a neurologist. (Tr. 706.) Trainor had also undergone a sleep study and had been diagnosed with sleep apnea and restless leg syndrome. (*Id.*)

Later in October 2007, Dr. Kamal Nangia evaluated Trainor for DDS. (Tr. 278-92.) Trainor weighed 228 pounds and stood 5' 5" tall. (Tr. 278, 293.) Trainor informed Dr. Nangia that she had a rash off and on, fibromyalgia (which made her feel tired all the time), diabetes, numbness in her

---

[3] "Tethered spinal cord syndrome is a neurological disorder caused by tissue attachments that limit the movement of the spinal cord within the spinal column. . . . These attachments cause an abnormal stretching of the spinal cord." National Institute of Neurological Disorders and Stroke, *NINDS Tethered Spinal Cord Syndrome Information Page*, http://goo.gl/KT0CIR (last visited Jan. 28, 2014.)

9

hands and feet, depression, and sleep apnea. (Tr. 278.) Dr. Nangia noted that Trainor did not use a cane for walking. (Tr. 280.) Following a physical examination, Dr. Nangia opined that Trainor could lift and carry 10 pounds up to one-third of a workday. (Tr. 286.) He also thought that she could sit, stand, and walk for 30 minutes each without interruption, and could sit, stand, or walk for six hours total during an eight-hour workday. (Tr. 286-87.) Regarding these limitations, Dr. Nangia explained, "her lower back pain gets worse [when] sitting in one position, standing, walking, [or] bending. Lumbar spine has restricted flexion [to] 70[] degrees." (Tr. 287.) Dr. Nangia further opined that Trainor could only occasionally climb stairs or ramps, and could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (Tr. 289.)

At her November 2007 visit with Hunt, Trainor again reported a few episodes of dizziness and blurry vision. (Tr. 704.) Hunt noted, "[Ms. Trainor] continued to do counseling and has obtained the cane that was described. She also did find a quad cane at a resale shop and using that versus the regular cane." (*Id.*)

In February 2008, Trainor told Hunt that she had seen an ophthalmologist who had attributed her dizziness and blurred vision to migraines. (Tr. 769.) "She has not had any further problems since then," wrote Hunt. (*Id.*) Trainor continued to report numbness in her legs and feet, especially on the left. (*Id.*) Trainor reported seeing a neurologist (likely Dr. Samuel) who had attributed the numbness to her diabetes. (*Id.*) Trainor's weight had increased to 242 pounds and Hunt counseled that the "increase in weight does not help any of her problems." (Tr. 770.)

10

### 3. Medical Treatment Following ALJ Neumann's May 2008 Decision

*Treatment of Trainor's Physical Conditions*

In July 2008, Trainor saw Hunt for dizzy spells and blurred vision, decreased appetite, and increased thirst and urination. (Tr. 458.) Trainor, however, had not checked her blood sugars in three months. (*Id.*) She had lost her glucometer and had not thought "too much about checking her sugar since it [had been] so good at her last visit." (*Id.*) Hunt again remarked, "[t]he patient continues to have great difficulty remembering which medicines are for what." (*Id.*) Hunt assessed uncontrolled diabetes and vision changes related to elevated blood sugars. (Tr. 459.) Later in July, Hunt reviewed Trainor's sugar logs: Trainor's sugars "remain[ed] quite elevated and a bit sporadic." (Tr. 457.) Hunt increased Trainor's insulin dosage. (*Id.*) She also gave Trainor a two-week "excuse from classes" due to "vision disturbance." (*Id.*)

At her September 2008 follow-up appointment, Hunt noted that Trainor's blood-sugar logs were still "rather erratic and slightly elevated." (Tr. 454.) Trainor reported that her vision had continued to worsen, especially at night. (*Id.*) Trainor mentioned stiffness and discomfort, but Hunt noted that she had not returned to her rheumatologist. (*Id.*) Trainor's anxiety attacks had also increased, and she was concerned that she would lose her insurance if her son began staying with his father. (*Id.*) Hunt advised Trainor to "[r]eturn to rheumatologist regarding fibromyalgia and . . . informed [Trainor] that part of her hip problem is probably related to her back/bulging disk and intermittent flare-ups will occur. (Tr. 455.)

In September 2008, Trainor returned to her neurologist, Dr. Samuel. (Tr. 433.) Trainor reported that her right leg had been giving out on her for three months and that she had fallen the week before. (*Id.*) Trainor also told Dr. Samuel that she had been having a lot of dizzy spells and

11

had been using a cane for the past few months. (*Id.*) On exam, Trainor's strength was five out of five in all extremities. (*Id.*) She was able to heel-to-toe walk. (*Id.*) Dr. Samuel diagnosed migraine and lumbar strain. (*Id.*; *see also* Tr. 430.) He prescribed Topamax and referred Trainor for a lumbar-spine MRI and an EMG. (*Id.*) The EMG study was normal without evidence of neuropathy or radiculopathy. (Tr. 432.) The MRI report was similar to that from September 2007: "[t]ethered cord with the tip of the conus extending down to the L4 level" a "fatty filum terminale," and "[m]inimal disc bulging at L4-5" with no evidence of spinal or foraminal stenosis. (Tr. 573.)

In October 2008, Trainor again told Dr. Samuel that her right leg had been giving out, but also reported having cramps while walking. (Tr. 430.) Trainor's "[m]igraines [were] under control with Topamax," however. (*Id.*) Dr. Samuel's exam findings were similar to those from the previous month. (*Id.*) He referred Trainor to a neurosurgeon. (*Id.*)

Accordingly, later in October, Trainor saw Drs. Todd Francis and Kenneth Casey, the latter a professor of neurosurgery. (Tr. 427-28.) Trainor reported that she had fallen off her porch a year earlier; "She has experienced some back pain from this in addition to her current diagnosis of fibromyalgia." (Tr. 427.) Trainor also informed the physicians that her right leg gave out, that a two-month stint of physical therapy for back pain had produced minimal results, and that Darvocet had not helped much. (*Id.*) Trainor also reported "a history of some urinary incontinence on laughing or straining and some bowel problems since she was a child." (*Id.*) On exam, Trainor used a cane to walk and favored her left leg. (*Id.*) She was "unable to walk on her heels or her tiptoes with extreme pain [*sic*]." (*Id.*) The physicians concluded, "Given this patient's complaints of bowel problems, it is likely that the symptoms of tethered cord will continue to increase as she gets older. Therefore, we have recommended to the patient that she have this problem corrected surgically."

(Tr. 428.)

In October 2008, Trainor had a follow up appointment with Hunt. (Tr. 452-53.) Trainor reported recently having "very bad back pain" that radiated down her leg. (Tr. 452.) Trainor was "doing much better with her sugars due to the change in insulin." (*Id.*) Hunt assessed diabetes with improved sugars, resolved nausea/stomach problems, depression and anxiety, chronic back pain, restless leg syndrome with sleep apnea, and controlled hypertension. (Tr. 453.) Hunt modified Trainor's medications; Trainor was to take Novolog and Glucophage (for her diabetes), Prilosec (a heartburn medication), Lisinopril (a medication for hypertension), Loratadine (an allergy medication), Requip (perhaps for Trainor's restless leg syndrome), Cymbalta (an antidepressant), Darvocet (a pain reliever), Flexeril (for generalized myalgia), Motrin (for generalized discomfort), and Xanax (presumably for anxiety). (Tr. 453.) As for surgery, Hunt "advised [Trainor] to seek another opinion and to think strongly before obtaining surgery on [her] back since there [were] several issues going on." (Tr. 453.) Hunt did not believe that surgery would remedy Trainor's discomfort. (*Id.*)

By her November 2008 visit with Hunt, Trainor had lost her health insurance coverage. (Tr. 451.) Trainor told Hunt that her fatigue had not improved. Trainor was "sleeping so-so at night." (*Id.*) Hunt assessed "[d]iabetes improved control," hyperlipidemia and "[e]levated sedate." (*Id.*) She also noted, "[Ms. Trainor] has continued to be confused about exactly what medications she is taking. We will make up a drug list and help the patient understand." (*Id.*)

In March 2009, Trainor complained of discomfort in her left arm and numbness in her third and fourth digits. (Tr. 449.) Hunt discussed various causes for the numbness, including that Trainor had been doing a lot of computer work and diabetes-related neuropathy. (Tr. 450.) Trainor again

reported that she felt as if her right leg was giving out at times. (Tr. 449.) Trainor's bedtime sugars were elevated, but she admitted taking her insulin incorrectly. (*Id.*) Trainor said that she and her roommate had been "trying to walk a mile," but leg discomfort prevented her from walking farther. (*Id.*)

In May 2009, Trainor saw Hunt for her annual exam. (Tr. 447.) Trainor weighed 219 pounds and Hunt described her as "pleasant, alert, well-nourished, well-kempt, overweight/obese, 38-year-old female, in [no acute distress]." (Tr. 447.) Hunt noted that because Trainor lacked insurance coverage, she had self-limited her medical care. (*Id.*) Trainor reported that she had been unable to sleep well at night. (*Id.*) Hunt noted that a higher Lyrica dosage had helped, but that Trainor was still having issues with her back and leg cramps prevented walking "very far." (*Id.*)

In August 2009, Trainor reported that she felt as if she was falling apart. (Tr. 754.) Trainor had been crying on a daily basis, felt very frustrated, and had money issues. (*Id.*) She also reported headaches, hot flashes, dry mouth, an increase in leg cramps with an inability to walk any distance, and poor sleep (even when using her CPAP machine). (*Id.*) Hunt observed that Trainor was "extremely emotional, tearful and rather distraught." (*Id.*) Hunt "discussed counseling at length" but also noted, "[d]ue to the patient's insurance, limited resources are available." (Tr. 755.) She provided Trainor with a crisis number. (*Id.*)

The next month, Trainor told Hunt that she had been seen by a "Disability psychiatrist" who had increased her dosage of Cymbalta and was trying to find counseling services for Trainor. (Tr. 751.) Trainor also reported that she was having problems with her right leg, including a recent fall. (*Id.*) Trainor was using a walker and cane for support. (*Id.*) Flexeril was helping Trainor with her leg cramps and to relax more at night, and Trazodone was also helping. (*Id.*) Hunt also noted, "The

14

Fioricet has helped with her headaches, and she has only had two or maybe three since her last visit here." (*Id.*)

In October 2009, in the context of a psychological evaluation, Trainor reported that she had fallen five to six times in the prior two months. (Tr. 463.)

In November 2009, Dr. R. Scott Lazzara evaluated Trainor's physical condition for DDS. (Tr. 488-92.) Trainor reported that she was able to walk about a half mile before getting weakness in her right leg. (Tr. 488.) She also provided that she could sit for about an hour and stand for 30 minutes, but could not lift more than five pounds. (Tr. 488.) On exam, Trainor had "mild difficulty getting on and off the examination table, mild difficulty heel and toe walking, moderate difficulty squatting, and was unable to hop." (Tr. 489.) A straight-leg-raising test was negative. (*Id.*) Trainor had tenderness and a reduced range of motion in her lumbar spine. (Tr. 489, 490.) Dr. Lazzra concluded that Trainor did "appear to have findings of weakness in the right leg" and "tenderness in the lower spine." (Tr. 492.) He thought that Trainor would benefit from using a cane when walking more than 50 yards. (*Id.*) In terms of functional capacity, Dr. Lazzara opined, "At this point avoidance of operation of foot controls, lifting of over 15 pounds, working at unprotected heights or with vibration would be indicated, as well as repetitious squatting, stooping, or bending. She may be able to tolerate a sedentary position if she is able to stand at will." (Tr. 492.)

Trainor next saw Hunt in May 2010. (Tr. 749-50.) Trainor reported poor sleep, including not falling asleep until 2:00 a.m., and that she was experiencing a lot of stressors in her life. (Tr. 749.) "[Ms. Trainor] admits that she believes she is very depressed. She has an increase in panic and anxiety." (*Id.*) Hunt increased Trainor's dosage of Trazodone in hopes that it would improve her depression and insomnia. (*Id.*) Hunt noted, "Will look into referring the patient for counseling. It

15

is of great difficulty to find someone who will take her." (Tr. 750.) Trainor also complained of problems with her right leg giving out. (Tr. 749.) Trainor had fallen three times, feeling dizzy before a "couple" of the falls. (*Id.*) Hunt ordered an EMG. (*Id.*)

At Trainor's follow up in June 2010, Hunt noted that the EMG showed "only mild little change . . . from last EMG of 2005." (Tr. 747.) Trazodone was helping Trainor sleep and her back felt better with Darvocet. (*Id.*)

In September 2010, a repeat MRI was taken of Trainor's lumbar spine. (Tr. 569-70.) The radiologist thought that there was "mild to moderate" biforaminal stenosis at L4-5, and mild left foraminal stenosis at L5-S1. (Tr. 570.)

The last treatment note from Hunt in the record corresponds to a September 2010 visit. (Tr. 753.) Trainor reported that her back pain had been slowly increasing. (*Id.*) Hunt reviewed the recent MRI and assessed "[i]ncrease in back pain relating to bulging disc, rule out tethered cord syndrome." (*Id.*) She referred Trainor to a neurosurgeon, prescribed Soma (a muscle relaxant) and Vicodin for pain. (*Id.*)

*Treatment for Trainor's Mental and Emotion Impairments*

In October 2009, Michelle Rousseau, Psy. D., evaluated Trainor's mental impairments for DDS. (Tr. 460-66.) In describing her depression, Trainor stated, "One minute I can be totally peed off. It don't matter what somebody says to me. I'll just be real mean. I'll cry about anything. Anything and I'm balling." (Tr. 462.) Trainor also provided that her energy level was "[v]ery low." (Tr. 463.) Trainor told Dr. Rousseau about her anxiety: "I get panic attack sometimes. I hyperventilate. I just get where . . . sometimes I can get on very crying spells or anything [*sic*]. It don't take much to make me cry. Feel like I'm going to pass out. I try to calm myself down. It takes

16

me a while. I usually take a Xanax to try to calm me down." (Tr. 463.) During the mental-status exam, Trainor could recall only one of three items (a hammer) after three minutes. (Tr. 465.) On the serial sevens test, a test of concentration and arithmetic skill requiring the examinee to repeatedly subtract seven starting from 100, P. Kazmark, *Validity of the Serial Seven Procedure*, 15 Int'l J. Geriatric Psychiatry 677 (2000), *available at* http://goo.gl/bf8iNq, Trainor answered slowly and incorrectly: she repeatedly subtracted 10 starting from 97. (Tr. 466.) Trainor did not know the meaning of certain sayings designed to test abstract thinking. (Tr. 466.) Dr. Rousseau noted, "Claimant appeared sincere in her symptom reports, though they appeared at least mildly exaggerated overall given the presence of dichotomous thinking, a tendency toward dramatic verbalizations, and impressions that she did not put forth her best effort on mental status inquiries." (Tr. 452.)

Upon completing her evaluation, Dr. Rousseau opined that Trainor presented with "moderated depression and anxiety symptoms," that the panic attacks Trainor described did not meet clinical criteria, and that Trainor's high caffeine intake likely increased her anxiety symptoms (Trainor drank one to two pots of coffee a day plus two or three glasses of caffeinated soda (Tr. 464)). (Tr. 466.) Dr. Rousseau thought that Trainor's description of her activities of daily living "suggest[ed]" that Trainor was "able to independently engage in a number of adaptive activities of daily living" and that Trainor "appear[ed] able to comprehend and follow basic instructions, and [was] likely able to perform a variety of activities." (Tr. 466-67.) She noted, however, that Trainor's "concentration skills appear at least mildly impaired, which may make it more challenging for her to retain newly acquired information, complete tasks in a timely fashion, and respond to changes appropriately in a work setting." (Tr. 467.) Dr. Rousseau also provided that Trainor's anxiety was

17

likely to make her uncomfortable in social situations, but that Trainor could "likely . . . interact adequately with co-workers, supervisors, and the general public." (Tr. 467.)

In November 2009, Robert Newhouse, M.D., reviewed Trainor's file, including Dr. Rousseau's report, and opined on Trainor's mental residual functional capacity. (Tr. 485; *see also* Tr. 469-86.) He gave Dr. Rousseau's report "great weight" and opined, "[the claimant] may have trouble with complex detailed tasks and function best in small familiar groups. Retains ability to do simple tasks on [a] sustained basis." (Tr. 485.)

In April or May 2010, Trainor's depression started to worsen and she began hearing voices. (*See* Tr. 506, 514.) When her symptoms continued, Trainor sought mental-health treatment through the Thumb Alliance Prepaid Inpatient Health Plan. (*See* Tr. 506.) In September 2010, Mande Franzel, a social worker and mental-health professional, performed the initial evaluation. (Tr. 506-17.) Trainor provided that she had been depressed most of her life and had received treatment for three years, but her depression had become more severe over the prior four months with isolation, suicidal thoughts, and a short temper. (Tr. 514.) Trainor said she had been sleeping poorly due to racing thoughts and night terrors. (*Id.*) Franzel noted, "[Ms. Trainor] [s]hared that she is having command hallucinations, voices telling her to hurt [her]self or yelling out her name." (*Id.*) Trainor also reported difficulties concentrating: "like going into a zone, like I am somewhere else." (*Id.*) Franzel diagnosed major depressive disorder, recurrent, severe, with psychotic features; generalized anxiety disorder; and assigned Trainor a Global Assessment of Functioning score of 40. (Tr. 514.) A GAF of 40 indicates, "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV*")

18

34 (4th ed., Text Revision 2000).

In October 2010, Trainor was evaluated by Dr. Barry Binkley, a psychiatrist associated with Thumb Alliance. (Tr. 528-32.) Trainor reported that she had taken Zoloft for about three years and, after it lost effectiveness, Cymbalta for a year, which had also become ineffective. (Tr. 529.) Trainor further provided that Wellbutrin was not helping her to quit smoking and Trazodone was not helping with sleep. (Tr. 529.) Dr. Binkley noted that Xanax was not effective against Trainor's anxiety and panic attacks. (*Id.*) Dr. Binkley performed a mental-status exam and found that Trainor "really needs a lot of help with memory and organizing skills and being effective in planning and initiating and following through on things." (Tr. 530.) He opined that Trainor's recent memory and immediate retention and recall "were moderate to severely impaired on history and also on exam." (*Id.*) Trainor was able to count backward by two starting from twenty, but, as before, could not perform the serial sevens test. (*Id.*) Dr. Binkley diagnosed Trainor with Bipolar II disorder, hypomanic. (Tr. 531.) He also diagnosed panic disorder without agoraphobia; generalized anxiety disorder; attention-deficit/hyperactivity disorder, inattentive type; and a rule-out diagnosis of cognitive disorder "secondary to diabetes and/or bipolar disorder." (*Id.*) Dr. Binkley's plan was to stop Wellbutrin, Trazodone, and Xanax, to start Klonopin (Clonazepam) and Lamictal, and to increase Cymbalta. (Tr. 532.)

Although only the first month of Trainor's therapy at Thumb Alliance is reflected in the record, those notes show improvement toward the end of the month. On October 14, 2010, Helena Witkowski, LMSW, noted, "No change. [C]lient presents as dysthymic and tearful with congruent affect." (Tr. 527.) On October 19, Witkowski wrote, "Regressed due to stressors. [Client] presents as anxious and tearful with congruent affect." (Tr. 533.) But on October 27: "Some improvement.

[Client] presents as anxious with congruent affect." (Tr. 534.) And on November 2, 2010: "Some continued improvement with happier mood. [Client] presents as euthymic with congruent affect." (Tr. 536.)

In November 2010, Trainor had a medication-review appointment with Dr. Binkley. (Tr. 535.) He wrote, "Client says she's showing good improvement as far as her depression, and she's tolerating her medication well. Since she's been on the increased Cymbalta and Clonazepam, she's not having any panic attacks, depression is much less, and she's not having any adverse side effects from any of her meds." (Tr. 535.) Dr. Binkley noted that Trainor's affect was normal, her mood was brighter, and her thought processes and content were normal. (*Id.*) Further, "She's concentrating good. Memory appears to be grossly normal." (*Id.*)

### C. Testimony at the Hearing Before the ALJ Lisewski

At her February 10, 2011 administrative hearing before the ALJ, Trainor testified to mental and physical impairments and the functional limitations caused by those impairments.

Trainor's counsel asked her to describe her bipolar symptoms. (Tr. 554.) Trainor, however, instead testified to what led her to seek mental-health treatment: "My regular doctor told me that I needed to see somebody because I was having them two and four and five times a week. . . . I was having where I felt like I was having shortness of breath, couldn't breath[e]. And I got to the point where I wouldn't even come out of my room." (*Id.*) When counsel later asked Trainor specifically about her ability to concentrate, Trainor provided that her mind was "always racing." (Tr. 558.) "I mean I could be thinking about anything and I just get myself over exerted and then I can't concentrate at all about anything that I'm supposed to do. . . . I can start something and then I'll be doing something else and forget what I was doing. I have a lot of trouble with that, the kids will ask

20

me something and we'll be talking about something and 10 minutes later I'll ask him the same questions all over again." (Tr. 558.) When asked about the side effects of her mental-health medications, Trainor said: "Drowsiness, sometimes I don't sleep good, sometimes I do. And I never have a full night of sleep, I'm always, my mind is always wondering. And a lot of reason that I went to see the psychiatrist because I was having suicide thoughts." (Tr. 555.) Trainor acknowledged that her therapy sessions were "[p]retty good," but characterized her mental health as "maintaining" as opposed to getting better or worse. (Tr. 562-63.)

Trainor also described her physical impairments. She said, "I'm in pain all the time, my lower back, my shoulders. . . . My neck." (Tr. 555.) Trainor also testified that her right leg would give out on her "all the time." (Tr. 556.) When her counsel asked if she could do anything "of a physical nature for a four hour period," Trainor responded,

> No, I can't stay in one spot for very long. I'll be in my chair and then I'll be up and I'll walk around for about 20 minutes or so, then I'll sit back down. I get very short of breath. I do try to watch TV a little bit but it's off and on. And most of the time I'll be awake and then I'm tired and then I'm awake and then I'm back to sleep. I try to stay up during the day so I can sleep at night and it just doesn't work. I always end up having to take a nap or so.

(Tr. 559-60.)

Trainor also testified to her daily activities. She stated that she did "some light housework," but nothing that involved bending "like taking clothes from the washer to the dryer." (Tr. 557.) She also stated that she did "light" cooking, but when she tried making "heavy meals," she found that she could not maintain her concentration long enough. (Tr. 557.) Trainor further testified that she would "watch some TV or . . . try to do some crafts." (Tr. 559.) "I try to do some writing and stuff and talk to the kids. I have tried to use the computer a little bit because it's the only way I can talk

21

to my children because they both live away from me." (*Id.*) When asked about how much she could lift while grocery shopping, Trainor responded, "I can't lift anything over 10 pounds." (Tr. 564.)

After Trainor testified, the ALJ asked a vocational expert whether there would be jobs for a hypothetical individual with functional limitations that the ALJ thought accurately portrayed Trainor's. In particular, the ALJ asked the expert to consider a hypothetical person of Trainor's age, education, and work experience who was limited to "sedentary" work with a sit-stand option and further limited by the inability to (1) sit, stand, or walk for more than 30 minutes at one time, (2) stand or walk for more than six hours total in an eight-hour day, (3) sit for more than six hours total in an eight-hour day, (4) engage in more than frequent handing or reaching, (5) climb ramps or stairs more than "occasionally," (6) balance, stoop, crouch, kneel, crawl, climb ropes, ladders, scaffolds, or work at unprotected heights, (7) work more than "occasionally" around machinery, or (8) operate a motor vehicle. (Tr. 564-65.) Further, the hypothetical person was limited to "simple and repetitive" work, which the ALJ defined as jobs classified as having a Specific Vocational Preparation level 1 or 2 in the Dictionary of Occupational Titles. (Tr. 564.) The expert thought that there would be jobs that this person could perform: surveillance system monitor, information clerk, and visual inspector. (Tr. 565.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

22

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Before turning to the five-step disability process, ALJ Lisewski addressed Trainor's application for disability insurance benefits. (Tr. 20.) The Social Security Administration had denied Trainor's application for disability insurance benefits because her alleged onset date was May 13, 2008, but she had only met the insured status requirements through December 31, 2006. *See* (Tr. 18, 20); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) ("In order to establish entitlement to

disability insurance benefits, an individual must establish that [s]he became 'disabled' prior to the expiration of his insured status." (citing 42 U.S.C. § 423(a) and (c); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988))). Noting that counsel had provided no explanation for why Trainor's date last insured was something other than December 31, 2006, the ALJ "affirm[ed] the Administration's calculation." (Tr. 20.)

Turning to Trainor's application for supplemental security income, ALJ Lisewski first found that Trainor had not engaged in substantial gainful activity since the alleged disability onset date of May 13, 2008. (Tr. 20.) At step two, she found that Trainor had the following "severe combination of impairments": "diabetes mellitus (type II); obesity with hypertension; fibromyalgia; history of sleep apnea; history of dermatomyositis; spinal stenosis and congenital "tethered cord" (spinal abnormality) with lumbar radiculopathy." (Tr. 20.) At step three, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 21.) The ALJ explained, "The burden of proof and the burden of going forward with the evidence is on the claimant at steps one through four of the sequential evaluation process. The claimant, who is represented by counsel, did not contend or advance any evidence to suggest that her impairments have ever, either singly or in combination, met or medically equaled the requirements of a listed impairment on a longitudinal basis." (Tr. 21.) Between steps three and four, the ALJ determined that Trainor had "the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except" that she was

> limited to performing repetitive tasks (those jobs defined as "SVP 1" and "SVP 2" by the Dictionary of Occupational Titles); . . .
>
> unable to sit, stand, or walk for more than 30 minutes without interruption and requires a "sit-stand" option; . . .

24

limited to 6 hours of cumulative sitting in an 8 hour workday; the claimant is limited to 6 hours of cumulative standing and/or walking in an 8 hour workday; . . .

limited to performing pushing and pulling with the upper and lower extremities; . . .

limited to frequently engaging in activities involving bilateral manual dexterity (both fine and gross manipulation); . . .

limited to frequent handling; . . .

limited to the occasional use of stairs and ramps; . . .

precluded from balancing, stooping, crouching, kneeling, crawling, using ropes, using ladders, using scaffolds, or working at unprotected heights; . . .

limited to occasionally working around moving machinery and occasionally operating a motor vehicle.

(Tr. 22 (paragraphing altered).) At step four, the ALJ found that Trainor was unable to perform any past relevant work. (Tr. 31.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Trainor's age, education, work experience, and residual functional capacity. (Tr. 31.) The ALJ therefore concluded that Trainor was not disabled as defined by the Social Security Act from the alleged onset date through the date of her decision. (Tr. 32-33.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

25

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Trainor's primary argument is that the ALJ erred in assessing her credibility. (*See* Pl.'s Mot. Summ. J. at 7-10.) Trainor also raises, sometimes in a single sentence, a number of other claims of error. (*See* Pl.'s Mot. Summ. J. at 1-3, 5, 10.) None of Trainor's arguments justify remand.

### A. The ALJ's Evaluation of Trainor's Credibility

An ALJ's credibility assessment proceeds in two steps and is owed considerable deference on judicial review. Where, as here, an ALJ concludes that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, an ALJ then evaluates the "intensity and persistence" of the claimant's symptoms. 20 C.F.R. § 416.929(c)(1). At this second step, an ALJ should not reject a claimant's allegations "solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 416.929(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. Instead, an ALJ should consider the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; factors that precipitate or aggravate the claimant's symptoms; the type, dosage, effectiveness, and side effects of the claimant's medication; treatment other than medication that the claimant receives; measures the claimant uses to relieve pain or other symptoms; and "[o]ther factors." 20 C.F.R. § 416.929(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight," S.S.R. 96-7p, 1996 WL 374186 at *2. Within this two-step framework, a court is to accord an "ALJ's determinations of credibility great

27

weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle.").

Trainor says that the ALJ "simply summarily concluded that because Plaintiff was able to do light cooking and appeared neat and orderly, her pain was not as severe as alleged." (Pl.'s Mot. Summ. J. at 9; *see also id.* at 10.) Trainor claims that her pain has been "unremitting" since she was diagnosed with fibromyalgia and diabetes. (Pl.'s Mot. Summ. J. at 9.) These arguments do not show that the ALJ reversibly erred.

As an initial matter, Trainor mischaracterizes the ALJ's credibility assessment. The ALJ did much more than cite Trainor's activities of daily living. In fact, she provided six reasons for discounting Trainor's credibility: (1) at the administrative hearing (and on a disability form), Trainor provided that she last worked in 2002 but treatment notes indicated that Trainor worked in 2007; (2) Trainor provided on a disability form that she could walk two to three blocks with a cane, but she told Dr. Lazzara that she could walk a half-mile before experiencing leg weakness; (3) Trainor had not been "entirely compliant in taking prescribed medications" suggesting that her symptoms may not have been as severe as she alleged; (4) Lyrica had been "generally successful" in controlling Trainor's fibromyalgia pain; (5) Trainor had failed to return to her rheumotologist despite Hunt's recommendation to do so; and (6) Trainor did not "follow up" with Dr. Casey regarding back surgery for her tethered cord. (Tr. 30-31.)

Among these six rationales, Trainor only challenges one. Trainor says that "with her mental disabilities and lack of concentration, she unintentionally forgets to take the medication." (Pl.'s Mot.

28

Summ. J. at 3.) She claims that "[i]t is the direct result of her impairments that cause her to be inconsistent in being compliant." (*Id.*) Further, says Trainor, "the lack of resources to pay for doctor visits and transportation to doctors has caused limitations for access to health care." (*Id.*)

Although Trainor fails to support her claim by citing to the record, a review of the record reveals that she in fact had some difficulties complying with her prescribed course of treatment. As provided above, Hunt noted, "[t]he patient continues to have great difficulty remembering which medicines are for what" (Tr. 458), and "[t]he patient does have some difficulty keeping all medications straight and knowing exactly what medications are for what, even though written instructions were given following each visit" (Tr. 719). Also, Trainor's psychological evaluations revealed difficulties with short-term memory and concentration. (Tr. 171, 465, 530; *but see* Tr. 535.)

But even if Trainor's mental impairments sometimes caused her to not take her medications, the inference the ALJ drew based on Trainor's noncompliance was not entirely faulty. In drawing the inference, the ALJ referred to "[t]he above discussion of the claimant's medical history." (Tr. 31.) Although it is unclear which part of the "above discussion" the ALJ was referring to, earlier in her narrative she did discuss Trainor's medical history pertaining to her diabetes. (Tr. 27.) In particular, the ALJ noted that during the summer of 2008, Trainor had not checked her sugars resulting in dizzy spells, blurred vision, dry mouth, and nausea. (Tr. 27.) Notably, part of Trainor's explanation for not managing her diabetes was that her symptoms had not been severe: "Since [Ms. Trainor] moved[,] she has been unable to locate her glucometer. She did not think too much about checking her sugar since it was so good at her last visit." (Tr. 458.) This statement lends some support to the claim that Trainor's symptoms, at least the ones associated with her diabetes, may not

have been as severe as she alleged.[4]

In any event, Trainor's claim that the ALJ erred in assessing her credibility centers on her allegations of disabling pain. (*See* Pl.'s Mot. Summ. J. 9-10.) At least in this regard, the ALJ gave adequate reasons for discounting Trainor's allegations.

First, the ALJ reasonably concluded that Lyrica had been "generally" effective in controlling Trainor's fibromyalgia pain. (*See* Tr. 31.) In February 2007, Trainor thought that the pain and tingling in her arms and legs might have been attributable to not taking Lyrica. (Tr. 715.) In March 2009, Hunt noted, "Since the patient has been off [of Lyrica] she has noted that it definitely did help." (Tr. 450.) And at the follow-up appointment in May 2009, although Trainor still had leg cramps and "residual issues with her back," she "fe[lt] that the increase in Lyrica ha[d] helped." (Tr. 447.) In September 2010, Trainor stated that Lyrica had helped with her muscle spasms. (Tr. 511.) Although Trainor also said that she still had pain despite taking Darvocet and Motrin (Tr. 511), she was likely referring to her back pain as Darvocet was the medication prescribed for that condition (*see* Tr. 747, 749, 753). Thus, the ALJ reasonably concluded that Lyrica was effective in reducing Trainor's fibromyalgia pain.

Although the ALJ's rationale does not account for her back pain, this does not render the ALJ's reasoning invalid. At the hearing, Trainor's testimony about the limiting effects of her pain was not based solely on her lumbar-spine condition. She provided: "I'm in pain all the time, my lower back, my shoulders. . . . My neck." (Tr. 555.) And when asked which medications she took

---

[4]Without elaboration, Trainor asserts, "The Administrative Law Judge incorrectly found that her diabetes was under control. [The Plaintiff] has a history of ups and downs which may be explained by her lack of concentration and pain." (Pl.'s Mot. Summ. J. at 10.) But, contrary to Trainor's assertion, the ALJ recognized that Trainor had "ups and downs" in the management of her diabetes. (Tr. 27.)

for her pain, Trainor identified, among others, Lyrica. (Tr. 556.) So the ALJ's finding that Lyrica controlled Trainor's fibromyalgia pain does support her decision to discount Trainor's allegations of pain.

Second, it was not unreasonable for the ALJ to conclude that Trainor's failure to disclose her part-time work in 2007 called her credibility into question. (*See* Tr. 30 ("The fact that the claimant provided inaccurate information on a matter so integral to determining disability suggests that much of what the claimant has alleged may be similarly unreliable.").) According to Hunt, Trainor "apparently, ha[d] been doing a part time job" in the summer of 2007. (Tr. 708.) Indeed, Trainor had been asked to work more and Hunt limited Trainor's work to only 20 hours per week. (*Id.*) Yet, at the hearing, when the ALJ asked Trainor when she last worked, Trainor replied, "2002." (Tr. 551; *see also* Tr. 553.) And on a "Claimant's Work Background" form Trainor submitted to the Social Security Administration in 2010, Trainor similarly indicated that her most recent job had ended in 2002. (Tr. 418; *see also* Tr. 419.) While her failure to disclose that she worked in 2007 might have been unintentional, it was not unreasonable for the ALJ to infer otherwise.

Third, although not in the portion of her narrative specifically addressing Trainor's credibility, the ALJ described some of Trainor's testimony as "vague and unconvincing." (Tr. 30.) In particular,

> The claimant presented rather vague testimony about the side effects of her prescribed medications. She said, "Drowsiness, um . . . . Some of them have side effects of you can't drive . . . um . . . I take so much it's hard to remember them all." (Digital Recording at 9:47 – 9:48). Despite this vague and unconvincing testimony, I find that the claimant's prescribed medications render her unable to perform complex tasks (as reflected in the above residual functional capacity assessment).

(Tr. 30.) Although the record reflects that Trainor did have difficulty recalling her medications and

what they were for, it was not unreasonable for the ALJ to have questioned Trainor's inability to more readily recall the effects she felt from her medications (even if she did not understand what they were or what they were for). *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying").

Further, the overall record does not strongly corroborate Trainor's testimony. Trainor's lower-extremity EMGs were negative. (Tr. 432, 747.) And until September 2010, none of Trainor's lumbar-spine MRIs reflected stenosis. (*Compare* Tr. 573, 576, *with* Tr. 570.) Trainor did report leg weakness, but it appears that none of Dr. Samuel, a neurologist, Dr. Casey, a neurosurgeon, or Hunt could, with any certainty, connect that symptom with a medical condition. (*Cf.* Tr. 455.) Trainor did not receive any significant treatment for dermatomyositis (at least apart from that provided for her fibromyalgia) during the disability period. And, as discussed, the ALJ explained why she was discounting Trainor's fibromyalgia pain. Further, Dr. Rousseau's report suggests that Trainor's allegations about her limitations may not have been entirely credible; she found that while Trainor "appeared sincere in her symptom reports," "they appeared at least mildly exaggerated overall given the presence of dichotomous thinking, a tendency toward dramatic verbalizations, and impressions that she did not put forth her best effort on mental status inquiries." (Tr. 452.) Trainor mentions that the ALJ discounted a function report completed by her longtime friend and roommate that presumably corroborates her testimony, but Trainor makes no argument as to why the ALJ erred in discounting that report. (Pl.'s Mot. Summ. J. at 10.) *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("[I]ssues which are adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks and citation omitted)); *Baldwin v. Astrue*, No. 08-395, 2009 WL 4571850, at *3 (E.D.Ky. Dec. 1, 2009) ("The Plaintiff is represented by counsel, and the Court is not required to formulate arguments on the Plaintiffs behalf.").

Before concluding, however, the Court notes that some of the ALJ's reasons for discounting Trainor's allegations are questionable. The ALJ noted an inconsistency between Trainor's function-report statement that she could walk two to three blocks with a cane and her statement to Dr. Lazzara that she could walk a half-mile before her right leg weakened. (Tr. 30-31 (citing Tr. 397, 488).) But the ALJ overlooked the fact that the very next line of Trainor's function report provides, "do walk mile when can." (Tr. 397.) And Dr. Lazzara provided that Trainor would benefit from a cane when walking distances over 50 yards. (Tr. 492.) Arguably then, Trainor's function report and Dr. Lazzara's report are more consistent than inconsistent. The ALJ also discounted Trainor's testimony because she did not follow up on Dr. Casey's recommendation for surgery. (Tr. 31.) But the ALJ failed to note that Dr. Casey saw Trainor once whereas Hunt had treated Trainor for years and told Trainor that she thought that back surgery would not relieve her symptoms because they were multi-faceted. (Tr. 453.) Finally, the ALJ said that "the claimant *failed to return* to her rheumatologist on a number of occasions, *against the recommendation* of Nurse Practitioner Hunt." (Tr. 31.) Earlier in her narrative, the ALJ identified two occasions where Trainor had not returned to her rheumatologist. (Tr. 28 (citing Tr. 715, 763-64).) But on at least one of the occasions, Trainor *did* return to her rheumatologist following Hunt's recommendation. (*See* Tr. 712, 715-16.)

The presence of these questionable rationales notwithstanding, the ALJ's credibility determination should be upheld. *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir.

2013) ("We recently held that even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it."). This Court owes considerable deference to an ALJ's credibility assessment. Further, Trainor has not challenged the ALJ's claim that Lyrica helped with her fibromyalgia pain. And, even now, she offers no explanation for failing to mention her part-time work in 2007. Thus, Trainor has failed to demonstrate that, as a whole, the ALJ's assessment of her allegations of disabling pain lacks substantial evidentiary support.

### B. Dr. Lazzara's Opinion

Trainor also challenges the ALJ's assessment of Dr. Lazzara's consultative examination opinion. (Pl.'s Mot. Summ. J. at 2.) Trainor says,

> Plaintiff's obesity is a "severe" impairment in combination with her lower back pain which impedes or significantly limits her ability to do basic work activities. Dr. Lazzara MD stated that she may be able to tolerate a sedentary position if she is able to stand at will. (ALJ Opinion page 29) The ALJ gave great weight to his opinion, however, this opinion does not consider her mental impairments or lack of education and concentration.

(Pl.'s Mot. Summ. J. at 2.)

The ALJ did not err in giving Dr. Lazzara's opinion "great weight." (Tr. 29.) In crediting Dr. Lazzara's opinion, the ALJ made plain enough that she was only doing so to the extent that the opinion supported her *physical* residual functional capacity assessment of Trainor. (*See* Tr. 29.) The ALJ addressed Dr. Lazzara's opinion in a section of her narrative titled "Physical Limitations: Opinion Evidence." (Tr. 29.) And in that section, she reasoned,

> Great weight has been given to this opinion, because it appears that Dr. Lazzara fully considered the claimant's combination of impairments. He also carefully examined the claimant's musculoskeletal system, to evaluate her complaints of back pain.

34

> Dr. Lazzara's assessment directly supports the above residual functional capacity finding. Thus, *with regard to her physical impairments*, the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision.

(Tr. 29-30 (emphasis added).) Accordingly, the fact that Dr. Lazzara's opinion did not account for Trainor's "mental impairments or lack of education and concentration," does not show that the ALJ unreasonably found that the opinion supported her physical residual functional capacity assessment.

### C. The Vocational Expert's Credibility

Trainor additionally asserts that the vocational expert's testimony is not substantial evidence supporting the ALJ's step-five finding that she could perform a significant number of jobs. (*See* Pl.'s Mot. Summ. J. at 5.) According to Trainor, the vocational expert was not credible. (*Id.*)

Trainor is correct that the vocational expert's testimony is not entirely credible. At the hearing, the ALJ limited the hypothetical person to "simple and repetitive [work]," which she "define[d] as SVP 1 and 2 type jobs." (Tr. 564.) The vocational expert provided that the hypothetical person could work as a "surveillance system monitor, DOT 377.367-010," "information clerk, DOT 237.367-022," and "visual inspector, DOT 739.687-182." (Tr. 565.) And, even though she was asked (Tr. 564), the vocational expert did not identify any conflicts between her testimony and the DOT (Tr. 564-66). Yet, as the ALJ explained in her decision, "the vocational expert's testimony about the hypothetical individual . . . being able to perform the job of 'information clerk' [is] inconsistent with the DOT. According to the DOT, this job has an SVP of '4.'" (Tr. 32.) Thus, Trainor has some basis for questioning the reliability of the vocational expert's testimony.

The Court, however, does not agree with the conclusion that Trainor draws from the vocational expert's mistake: "if [the vocational expert] was inconsistent with [the information clerk]

job, which the ALJ acknowledged, the other jobs are inconsistent with Plaintiff's residual functional capacity." (Pl.'s Mot. Summ. J. at 5.) It is possible to infer that because the vocational expert was mistaken as to the SVP rating of one of the jobs she identified, other aspects of her testimony were also mistaken. But that inference is not particularly strong. Trainor identifies no other errors in the vocational expert's testimony nor did she challenge the expert's credentials at the hearing. (*See* Tr. 564.) The ALJ verified that the other two jobs the expert identified (surveillance system monitor and visual inspector) were classified as SVP level 1 or 2. (Tr. 32.) The standard of review is substantial evidence, and the Court cannot say that the ALJ unreasonably relied upon the vocational expert's testimony even though it was mistaken on one point.

It follows that Trainor's conclusory statement that the jobs the vocational expert identified are "above her residual functional capacity" is without merit. (Pl.'s Mot. Summ. J. at 11.)

### D. The ALJ's Evaluation of Trainor's Mental Functional Capacity

Trainor also claims that she is unable to perform the jobs identified by the vocational expert because "she is not able to complete a task at an acceptable rate of speed or consistency." (Pl.'s Mot. Summ. J. at 10-11.) But Trainor cites no evidence in support of this argument. This claim of error is thus arguably forfeited. *Kennedy*, 87 F. App'x at 466; *Baldwin*, 2009 WL 4571850, at *3. To the extent that it is not, it lacks merit.

To be sure, the record reflects that Trainor did have some difficulties in concentration, persistence, or pace. As noted, Trainor had difficulty keeping her medications straight. And at her consultative exam with Dr. Rousseau, Trainor could not complete the serial sevens test. Further, at her initial evaluation with social worker Franzel, Trainor reported that she would "go[] into a zone, like I am somewhere else." (Tr. 514.)

36

The question, however, is not whether substantial evidence supports greater limitations than those the ALJ included in her residual functional capacity assessment, but whether substantial evidence supports the ALJ's mental residual functional capacity assessment. *See Cutlip*, 25 F.3d at 286 (providing that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed . . . even if substantial evidence also supports the opposite conclusion").

Here, the record as a whole substantially supports the ALJ's belief that Trainor could perform jobs with a DOT SVP level 1 or 2, which is akin to "unskilled" work. *See* S.S.R 00-4p, 2000 WL 1898704 at *3 ("Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2 . . . in the DOT"); *see also* 20 C.F.R. § 416.968 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."). First, Dr. Rousseau's statements about Trainor's concentration problems are both vague and equivocal. She provided that Trainor's concentration skills "appear at least mildly impaired" which "may" make it more challenging for Trainor to complete a number of job tasks. (Tr. 467.) Notably, Dr. Rousseau additionally provided, "Based on the information gathered in this assessment, this individual appears able to comprehend and follow basic instructions, and she is likely able to perform a variety of activities." (Tr. 466.) Second, although Trainor emphasizes statements in Franzel's initial report and the low GAF score Dr. Binkley assigned following his initial assessment (Pl.'s Mot. Summ. J. at 1-2, 3), it is at least equally probative that, following a short period of treatment, Trainor's symptoms markedly improved (*see* Tr. 535). A month after his initial assessment, Dr. Binkley provided, "[Ms. Trainor is] concentrating good. [Her] [m]emory appears to be grossly normal." (Tr. 535.) Third, Dr. Newhouse, who reviewed Trainor's file and Dr. Rousseau's report, thought that Trainor had "moderate" difficulties in concentration, persistence,

or pace, but nonetheless "retain[ed] ability to do simple tasks on [a] sustained basis." (Tr. 479, 485.) In all, substantial evidence supports the ALJ's mental residual functional capacity. It was not unreasonable for the ALJ to conclude that Trainor could perform jobs with a DOT SVP level 1 or 2.

### E. The ALJ Failed to Obtain an Expert Opinion on Equivalence

Although none of Trainor's arguments justify remand, her arguments did require the Court to review the administrative record in some detail. During that review, an error in the proceedings before the ALJ revealed itself. In particular, the administrative record lacks an expert opinion on whether Trainor's physical impairments (alone or combined with her mental impairments) medically equal any listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Although this Court does not generally raise issues sua sponte, it is warranted in this case. *See Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *3 n.5 (E.D. Mich. Sept. 25, 2013) (finding no error in magistrate judge *sua sponte* raising the absence of an expert opinion on equivalence).

Social Security Ruling 96-6p, and decisions from this judicial district, require a medical expert's opinion on the issue of equivalence:

> [L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6p, 1996 WL 374180, at *3 (1996); *Fowler*, 2013 WL 5372883, at *4 (collecting cases and remanding because there was no expert medical opinion on the issue of equivalence); *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013) (remanding for an expert opinion at step three); *see also* 20 C.F.R. § 416.926(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the

Commissioner."). Although the Sixth Circuit has not directly addressed the issue, it has reasoned that, "[g]enerally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995).

Social Security Ruling 96-6p goes on to provide guidance as to the type of documents that may constitute a medical expert's opinion on the issue of equivalence:

> The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.

SSR 96-6p, 1996 WL 374180, at *3 (1996).

This Court has reviewed the record and concludes that it does not contain a medical expert's opinion on whether the combination of Trainor's mental *and physical impairments* are equal to any listed impairment. It is true that the administrative record contains a "Disability Determination and Transmittal Form" as referenced in SSR 96-6p. (Tr. 296.) And the Court acknowledges that the Transmittal Form provides "Primary Diagnosis[:] Fibromyalgia." (*Id.* (capitalization altered).) Further still, the Transmittal Form is signed by Dr. Newhouse, a medical doctor. (*Id.*) The problem, however, is that the signature box of the Transmittal Form (titled "Physician or Medical Spec. Signature") says "See PRTF dated 11/22/2009." (*Id.*) A review of the referenced Psychiatric Review Technique Form, along with the associated Mental Residual Functional Capacity Form, reveals that Dr. Newhouse focused only on Trainor's mental impairments. (*See* Tr. 469-86.) Indeed, it appears,

save for one of Hunt's records, that Dr. Newhouse did not even review any of the medical evidence pertaining to Trainor's physical impairments. (*See* Tr. 481.) Nor do the findings by Dr. Lazzara suffice as an expert opinion on equivalence. (*See* Tr. 488-92.) Dr. Lazzara does not mention any listing or otherwise indicate that he considered the issue of equivalence. (*See id.*)

Finally, this is not a case where the Court feels comfortable analyzing equivalence in the first instance. Indeed, it may be that this Court should never do so. *Barnett*, 381 F.3d at 670 ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *Stratton v. Astrue*, No. 11-CV-256-PB, 2012 WL 1852084, at *12 (D.N.H. May 11, 2012) ("'The basic principle behind SSR 96-6p is that while an ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings, expert assistance is crucial to an ALJ's determination of whether a claimant's ailments are equivalent to the Listings.'" (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D.Tex. May 23, 2008))); *Freeman v. Astrue*, No. 10-0328, 2012 WL 384838, at *5 (E.D. Wash. Feb. 6, 2012) ("Neither the ALJ nor this court possesses the requisite medical expertise to determine if Plaintiff's impairments (including pain) in combination equal one of the Commissioner's Listing.").  But even if, in some cases, the administrative record permits a lay-person to conclude that the record does not demonstrate equivalence, this is not such a case. The administrative record, summarized in detail above, indicates that Trainor has significant physical impairments that might equal a listing. Take, for example, Listing 1.04, which provides,

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by

> neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, Subpt. P, App'x 1. Here, Trainor has an MRI demonstrating stenosis (Tr. 569-70), she has been found to have limited range of motion in her lumbar spine by Dr. Lazzara and Dr. Nangia (Tr. 282, 490), she has motor loss as evidenced by her leg repeatedly giving out resulting in multiple falls (*e.g.*, Tr. 433), and she has had a positive straight-leg raising test (although seemingly not during the disability period) (Tr. 280). It is not clear whether Trainor has "sensory or reflex loss" or positive straight-leg raising tests in both the sitting and supine position. But, on an equivalence analysis, Trainor's other impairments—including diabetes, tethered cord, dermatomyositis, and fibromyalgia—are relevant, and it is the combination of impairments that should be assessed by a medical expert.

Accordingly, the Court recommends that this case be remanded for a medical expert's opinion on equivalence.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court concludes that Trainor has not shown that the administrative law judge reversibly erred in assessing her credibility and has not otherwise demonstrated reversible error. The Court, however, believes that the ALJ's failure to obtain an expert opinion on the issue of equivalence is not plainly harmless and justifies remand. As such, this Court RECOMMENDS that Trainor's Motion for Summary Judgment (Dkt. 14) be GRANTED IN PART, that the Commissioner's Motion for Summary Judgment (Dkt. 17), be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the disability determination of the Commissioner

41

of Social Security be REMANDED. On remand, should a medical expert conclude that Trainor does not meet any of the Administration's listed impairments, the ALJ should not be required to revisit any of her findings.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: February 13, 2014

42

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 13, 2014.

s/Jane Johnson
Deputy Clerk